UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

STEPHANIE K.,

                Plaintiff,

      v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
_____

**DECISION AND ORDER**

6:20-CV-06838 EAW

## INTRODUCTION

Represented by counsel, Plaintiff Stephanie K. ("Plaintiff") brings this action pursuant to Title II of the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner," or "Defendant") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Dkt. 1). This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Dkt. 14; Dkt. 20) and Plaintiff's reply (Dkt. 21). For the reasons discussed below, Plaintiff's motion (Dkt. 14) is granted, the Commissioner's motion (Dkt. 20) is denied, and the matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order.

## BACKGROUND

Plaintiff protectively filed her applications for SSI and DIB on May 26, 2017, and October 24, 2017, respectively.  (Dkt. 13 at 18, 182-87, 175-81).[1]  In her applications, Plaintiff alleged disability beginning on April 1, 2017.  (*Id.* at 18, 175, 182).  Plaintiff's applications were initially denied on February 1, 2018.  (*Id.* at 18, 100-05).   A video hearing was held before administrative law judge ("ALJ") Jennifer Gale Smith on July 23, 2019.  (*Id.* at 35-71).  Plaintiff appeared in Horseheads, New York, and the ALJ presided over the hearing from Syracuse, New York.  (*Id.* at 18).  On August 9, 2019, the ALJ issued an unfavorable decision.  (*Id.* at 18-30).  Plaintiff requested Appeals Council review; her request was denied on August 18, 2020, making the ALJ's determination the Commissioner's final decision.  (*Id.* at 4-9).  This action followed.

## LEGAL STANDARD

### I.    District Court Review

"In reviewing a final decision of the [Social Security Administration ("SSA")], this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotation omitted); *see also* 42 U.S.C. § 405(g).  The Act holds that a decision by the Commissioner is "conclusive" if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence means more

---

[1]    When referencing the page number(s) of docket citations in this Decision and Order, the Court will cite to the CM/ECF-generated page numbers that appear in the upper righthand corner of each document.

than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quotation omitted).  It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quotation omitted); *see also Wagner v. Sec'y of Health & Human Servs*., 906 F.2d 856, 860 (2d Cir. 1990) (holding that review of the Secretary's decision is not *de novo* and that the Secretary's findings are conclusive if supported by substantial evidence).  However, "[t]he deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003) (citing *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).

## II.    **Disability Determination**

An ALJ follows a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act.  *See Bowen v. City of New York*, 476 U.S. 467, 470-71 (1986).  At step one, the ALJ determines whether the claimant is engaged in substantial gainful work activity.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, in that it imposes significant restrictions on the claimant's ability to perform basic work activities.  *Id*. §§ 404.1520(c), 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, the analysis concludes with a

finding of "not disabled." If the claimant does have at least one severe impairment, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. §§ 404.1520(d), 416.920(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement (*id*. §§ 404.1509, 416.909), the claimant is disabled. If not, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the ability to perform physical or mental work activities on a sustained basis, notwithstanding limitations for the collective impairments. *See id*. §§ 404.1520(e), 416.920(e).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits the claimant to perform the requirements of his or her past relevant work. *Id*. §§ 404.1520(f), 416.920(f). If the claimant can perform such requirements, then he or she is not disabled. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. §§ 404.1520(g), 416.920(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of the claimant's age, education, and work experience. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation omitted); *see also* 20 C.F.R. §§ 404.1560(c), 416.960(c).

- 4 -

## DISCUSSION

**I.     The ALJ's Decision**

In determining whether Plaintiff was disabled, the ALJ applied the five-step sequential evaluation set forth in 20 C.F.R. §§ 416.920 and 404.1520.  Initially, the ALJ determined that Plaintiff met the insured status requirements of the Act through September 30, 2021.  (Dkt. 13 at 20).  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful work activity since April 1, 2017, the alleged onset date.  (*Id.*).

At step two, the ALJ found that Plaintiff suffered from the severe impairments of: Depressive Disorder, Anxiety Disorder, Post-Traumatic Stress Disorder ("PTSD"), Impulse Control Disorder, Substance Abuse Disorder, Attention-Deficit/Hyperactivity Disorder (ADHD), Asthma, Chronic Obstructive Pulmonary Disease ("COPD"), and Obesity.  (*Id.* at 21).  The ALJ further found Plaintiff's migraine headaches to be non-severe.  (*Id.*).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any Listing. (*Id.*).  The ALJ particularly considered the criteria of Listings 3.00, 3.02, 3.03, 3.11, 3.14, 12.04, 12.06, 12.15, and Plaintiff's obesity in reaching her conclusion.  (*Id.* at 21-23).

Before proceeding to step four, the ALJ determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the additional limitations that:

> she should not climb ladders, ropes or scaffolds; she should not kneel, crouch or crawl; she can occasionally climb ramps, climb stairs, balance and stoop.

> [Plaintiff] should have no more than occasional exposure to concentrated respiratory irritants such as dust, odors, fumes, gases, humidity and extreme hot and cold temperatures. [Plaintiff] should work at simple, routine and repetitive tasks. She should work in a low-stress job, defined as occasional decision-making, occasional judgment required and occasional changes in the work setting. She should work at goal-oriented work, rather than production pace rate work. [Plaintiff] should have only occasional contact with coworkers and supervisors, and no contact with the general public.

(*Id.* at 23-24). At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (*Id.* at 28).

At step five, the ALJ relied on the testimony of a vocational expert ("VE") to conclude that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including the representative occupations of photocopying-machine operator, order caller, and housekeeping cleaner. (*Id.* at 29). Accordingly, the ALJ found that Plaintiff was not disabled as defined in the Act at any time from the alleged onset date through the date last insured. (*Id*. at 30).

## II.    <u>Remand of this Matter for Further Proceedings is Necessary</u>

Plaintiff asks the Court to remand this matter to the Commissioner, arguing that the ALJ committed reversible error by: (1) engaging in cherry-picking the evidence which resulted in errors in the assessment of medical opinion evidence; (2) establishing an RFC with unsupported non-exertional limitations; and (3) making a step five determination not supported by substantial evidence. (Dkt. 14-1 at 8-27). For the reasons set forth below,

the Court finds that the ALJ failed to adequately assess the medical evidence and opinions of record, and this error necessitates remand for further administrative proceedings.

## A.    <u>Cherry-Picking of Evidence and Assessment of Medical Opinions</u>

Plaintiff argues that the ALJ failed to properly assess the evidence, including the mental health-related medical opinions, in establishing the RFC.   In response, the Commissioner argues that the ALJ thoroughly examined the medical evidence and opinions offered and properly evaluated them in developing the RFC.   The Court agrees with Plaintiff.

In deciding a disability claim, an ALJ is tasked with "weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole."   *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013).   An ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [her] decision."   *Id.* However, an ALJ is not a medical professional, and "is not qualified to assess a claimant's RFC on the basis of bare medical findings."   *Ortiz v. Colvin*, 298 F. Supp. 3d 581, 586 (W.D.N.Y. 2018) (quotation omitted)).   In other words:

> An ALJ is prohibited from "playing doctor" in the sense that an ALJ may not substitute [her] own judgment for competent medical opinion.  This rule is most often employed in the context of the RFC determination when the claimant argues either that the RFC is not supported by substantial evidence or that the ALJ has erred by failing to develop the record with a medical opinion on the RFC.

*Quinto v. Berryhill*, No. 3:17-cv-00024 (JCH), 2017 WL 6017931, at *12 (D. Conn. Dec. 1, 2017) (quotation and citation omitted).

Similarly, the ALJ may not "cherry pick" evidence. *Lee G. v. Comm'r of Soc. Sec.*, No. 5:19-CV-1558(DJS), 2021 WL 22612, at *5 (N.D.N.Y. Jan. 4, 2021) ("Cherry picking refers to improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source." (citation omitted)); *Starzynski v. Colvin*, No. 1:15-cv-00940(MAT), 2016 WL 6956404, at *3 (W.D.N.Y. Nov. 29, 2016) ("It is plainly improper for an ALJ to cherry-pick evidence that supports a finding of not-disabled while ignoring other evidence favorable to the disability claimant.") (citing *Trumpower v. Colvin*, No. 6:13-cv-6661 (MAT), 2015 WL 162992, at *16 (W.D.N.Y. Jan. 13, 2015)). "Cherry picking can indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." *Younes v. Colvin*, No. 1:14-CV-170(DNH/ESH), 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015) (quotation and citation omitted).

The Commissioner's regulations relating to the evaluation of medical evidence were amended for disability claims filed after March 27, 2017. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844-01, at *5844 (Jan. 18, 2017). Because Plaintiff's claims were filed on May 26, 2017, and October 24, 2017, the new regulations, codified at 20 C.F.R. §§ 404.1520c and 416.920c, apply.

Pursuant to the new regulations, the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Further, when a medical source

provides one or more medical opinions, the Commissioner will consider those medical opinions from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of the applicable sections. *Id*. Those factors include: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, purpose and extent of the treatment relationship, and the examining relationship; (4) specialization; and (5) any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id*. at §§ 404.1520c(c), 416.920c(c).

When evaluating the persuasiveness of a medical opinion, the most important factors are supportability and consistency. *Id*. at §§ 404.1520c(a), 416.920c(a). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(1), 416.920c(c)(1). With respect to "consistency," the new regulations prove that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(2), 416.920c(c)(2).

The ALJ must articulate his consideration of the medical opinion evidence, including how persuasive he finds the medical opinions in the case record. *Id*. at

§§ 404.1520c(b), 416.920c(b).  "Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still articulate how [he or she] considered the medical opinions and how persuasive [he or she] find[s] all of the medical opinions." *Andrew G. v. Comm'r of Soc. Sec.*, No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020) (quotations and citation omitted).  Specifically, the ALJ must explain how he considered the "supportability" and "consistency" factors for a medical source's opinion.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  The ALJ may—but is not required to—explain how she considered the remaining factors.  *Id.*

Plaintiff contends that the ALJ ignored or downplayed material evidence of Plaintiff's significant diminished capacity, resulting in flawed factual findings.  She further argues that this error then infected the analysis of three medical opinions relating to Plaintiff's mental impairments from Daniel Brown, Psy.D., Amanda Slowik, Psy.D., and Jessie Atkins, D.O.  The Court agrees.

With respect to the factual findings concerning Plaintiff's mental health, the ALJ stated that "the medical record also indicates that [Plaintiff] exhibits an overall positive response to medication management and formal outpatient mental health treatment" and that her symptoms "appear to be adequately controlled with periodic medication management and counseling sessions."  (Dkt. 13 at 25).  The ALJ further noted that although Plaintiff had sought inpatient psychiatric treatment during the period at issue, she did not require recurrent hospital visits or placement in a care facility for uncontrolled

psychiatric symptoms.  He noted her own report "that Xanax and occasional cannabis use were helpful for her anxiety" and that she "told care providers that she was feeling a lot better."  (*Id.*).  The ALJ stated that "[c]are providers described [Plaintiff's] anxiety to be well controlled," "described [Plaintiff] to be doing very well on her bipolar medication," and that she presented for treatment with a normal mood and affect.  (*Id.*).

As to Plaintiff's hospitalization in April of 2019, the ALJ described the treatment as follows:

> In April of 2019, [Plaintiff] sought emergency department treatment for depression and suicidal ideation (Ex. 8F, p. 65), but the record demonstrates that this was an acute episode, brought on by unusual circumstances. [Plaintiff] presented at the hospital tearful, and she described her mood as anxious and depressed.  She reported poor appetite and disturbed sleep. [Plaintiff] informed hospital staff of recent stressors, including a Child Protective Services (CPS) investigation, as well as "profound guilt" after having lost a large sum of money (Ex. 8F, p. 130).  [Plaintiff] told hospital staff that she had been unable to take her medications for about a week, because of a gastric condition which was causing nausea and vomiting (Ex. 8F, pp. 132, 1-3).  [Plaintiff's] insight and judgment were poor (Ex. 8F, p. 68) and she reported having a plan to hang herself.  Hospital staff admitted [Plaintiff] for inpatient treatment (Ex. 8F, p. 69).  However, [Plaintiff] was much improved once hospital staff administered medications.  [Plaintiff] did not present as agitated.  She spoke in a calm tone; staff observed [Plaintiff] being increasingly social (Ex. 8F, pp. 119, 126).  [Plaintiff] denied depression, and stated that her anxiety was moderate, and much improved from its intensity upon admission (Ex. 8F, p. 142).  [Plaintiff] was no longer showering excessively, as she had upon arrival, to cope with her anxiety (Ex. 8F, p. 146, 168, 220).  [Plaintiff] attended group therapy sessions, and was visible on the unit with a bright, smiling affect, being social with both peers and staff (Ex. 8F, pp. 142, 168).  Mental status examination results indicated improved insight, judgment and concentration (Ex. 8F, p. 165).  [Plaintiff] reported having a good mood all day (Ex. 8F, p. 168), and she related that she was pleased her concentration had improved to the extent that she could read a book (Ex. 8F, p. 195).  Upon discharge, [Plaintiff] was still experiencing some anxiety, but stated she was feeling better, with less need

> for her medications.  [Plaintiff] reported she was sleeping well, and that her
> appetite was good (Ex. 8F, p. 232).

(*Id.* at 25-26).

 In her assessment of the opinion evidence relating to Plaintiff's mental health impairments, the ALJ first considered an opinion of Dr. Brown, a state agency medical consultant, in connection with the analysis at step three.  (*Id.* at 23).  Dr. Brown concluded that Plaintiff's impairments did not meet or medically equal the criteria of any listing.  The ALJ noted that Dr. Brown is a program knowledgeable expert and found his listing opinion consistent with the record as a whole.  The ALJ also assessed Dr. Brown's opinions in connection with the RFC analysis.  (*Id.* at 27).  With respect to Dr. Brown's RFC opinions, the ALJ stated:

> Following his review, state agency consultant Dr. Brown identified moderate
> limitations in the [Plaintiff's] social interaction and concentration.
> Nonetheless, he stated that [Plaintiff] retained the ability to do simple work
> in a low contact setting (Exs. 1A, p. 11; 2A, p. 11).  Dr. Brown is a mental
> health expert, who has extensive knowledge of Agency programs and
> standards.  No evidence was submitted following Dr. Brown's review which
> would militate against his conclusions.  For these reasons, the undersigned
> finds Dr. Brown's statement persuasive.

(*Id*. at 27).

 The ALJ also considered the opinion of Dr. Slowik, who conducted a consultative psychiatric evaluation on January 3, 2018, as part of the step three determination.  (Dkt. 13 at 22, 341-45).  Dr. Slowik identified diagnoses of complex PTSD, generalized anxiety disorder, and history of marijuana abuse in sustained remission.  (*Id*. at 345).  Dr. Slowik opined that Plaintiff is moderately limited in the ability to use reason and judgment to make

work-related decisions; moderately to markedly limited in the ability to interact adequately with supervisors, co-workers, and the public and maintain an ordinary routine; mildly limited in sustaining concentration and maintaining personal hygiene; and markedly limited in her ability to regulate emotion. (*Id.* at 344).

The ALJ found Dr. Slowik's opinion to be significantly less persuasive. (*Id.* at 27). She explained her reasoning for finding the opinion to be less persuasive as follows:

> Following her evaluation, Dr. Slowik made a guarded prognosis of the claimant's condition. She described mild to moderate limitations in [Plaintiff's] concentration, and in her ability to use reason and judgment, positions generally consistent with the clinical record. However, Dr. Slowik additionally described moderate to marked limitations in social functioning and the ability to sustain a routine, and marked limitations concerning [Plaintiff's] ability to regulate emotions. These limitations appear to be based at least partly on [Plaintiff's] subjective reports, as they are not supported by the treatment records. Progress notes include multiple statements from [Plaintiff] and her care providers describing [Plaintiff] to be doing well on medication (Ex. 7F, pp. 6, 13, 18, 28). The undersigned notes that [Plaintiff] did not provide Dr. Slowik with an entirely accurate history. For example, [Plaintiff] did not inform Dr. Slowik of her continuing cannabis use, stating instead that she had quit several years earlier (Ex. 3F, p. 2). The limitations Dr. Slowik describes regarding [Plaintiff's] ability to sustain a routine are speculative, and have not been adopted.

(*Id.* at 27).

The ALJ also addressed the opinion of Dr. Atkins, Plaintiff's treating physician. Dr. Atkins completed two questionnaires, both dated June 7, 2019 (*id.* at 740-41, 744-45), in which he opined that Plaintiff would be off task more than 33% of the day (*id.* at 740). Dr. Atkins indicated that Plaintiff would have good days and bad days (*id.* at 740) but would likely miss more than 4 days per month due to bad days (*id.* at 741). Dr. Atkins noted that common side effects of Plaintiff's medications are dizziness, fatigue, headaches, impaired

coordination, irritability, confusion, restlessness, or blurred vision.  (*Id.*).  Dr. Atkins

opined that Plaintiff has marked limitations in maintaining attention and concentration,

maintaining regular attendance, performing activities within a schedule, and accepting

instructions and responding appropriately to criticism from supervisors.  (*Id.* at 744).  He

opined that she had medium limitations in her ability to interact appropriately with the

general public, get along with co-workers, and respond appropriately to ordinary stressors

in a work setting.  (*Id.* at 744).  Dr. Atkins noted that Plaintiff frequently cries during

appointments, seems overwhelmed, is always very anxious, has difficulty sleeping, and has

required inpatient psychiatric hospitalizations.  (*Id.* at 745).

The ALJ addressed Dr. Atkins' opinions as follows in her decision:

> Jessie Atkins, D.O., submitted two descriptions of [Plaintiff's] functioning,
> primarily identifying anxiety and the side effects of medication as the basis
> for the identified limitations (Exs. 9F, 10F).  Dr. Atkins described [Plaintiff]
> as capable of frequently lifting 10 pounds, occasionally lifting over 10
> pounds, and capable of standing or walking 6-7 hours a day, a depiction not
> inconsistent with light exertion.  Dr. Atkins further described [Plaintiff] to
> have marked limitations in concentration and persistence, and in the ability
> to respond to criticism from supervisors.  These limitations are poorly
> supported by the multiple reports of improved concentration (Ex. 7F, p. 14;
> Ex. 8F, pp. 165, 195) and improved emotional stability (Ex. 7F, pp. 6, 13,
> 17, 28) present in the record.  Dr. Atkins states that the side effects of
> [Plaintiff's] medication would cause fatigue, a position not supported by
> [Plaintiff's] reports of experiencing no side effects (Ex. 7F, p. 9).  As with
> Dr. Slowik, Dr. Atkin's estimates of likely workplace attendance and time
> spent off task are speculative.  For these reasons, the undersigned finds Dr.
> Atkin's opinions concerning [Plaintiff's] physical abilities to be of some
> limited persuasiveness, but her assessments of [Plaintiff's] mental
> functioning to be generally unpersuasive.

(*Id.* at 27-28).

As set forth above, the ALJ's factual findings conclude that Plaintiff was doing well on medication and had improved emotional stability. As support for this conclusion, the ALJ cites to several of Dr. Atkins' records reflecting the same: a January 6, 2019 treatment note indicating that Plaintiff's "mood has been doing well," (*id.* at 425), a February 26, 2019 record that she "has been feeling a lot better recently" and "feels as though her current Xanax dosing is helping," (*id.* at 414), a March 13, 2019 record indicating that "her anxiety has been much better recently" and she was "[d]oing well on the Xanax," (*id.* at 410), and an April 17, 2019 notation that her "anxiety continues to do well" and she "feels that the current Xanax dose is working," (*id.* at 402). While those records do in fact reflect that Plaintiff's anxiety was reported as stable on those particular dates and support the ALJ's conclusions, the administrative record is also replete with entries to the contrary.

For example, in May of 2016, Plaintiff rated her depression a "7" and anxiety a "10" (*id.* at 284), in August of 2016, she reported having some suicidal thoughts and crying and feeling helpless all of the time (*id.* at 333), and in October of 2016, she felt overwhelmed and had weekly death wishes to stop the pain, but denied specific suicidal ideation of intention (*id.* at 325).

In May of 2017, she described her anxiety to be awful and indicated that she had reported to the behavioral sciences unit of the hospital for suicidal ideations (*id*. at 271), in September of 2017, she reported suicidal thoughts (*id.* at 295), in October of 2017, she reported that her anxiety was "to the max," she was on edge constantly, and admitted

having thoughts that the only way to stop her anxiety was to not be alive (*id.* at 264), and in December of 2017, she reported her anxiety as "awful," (*id.* at 252).

In January of 2018, Plaintiff indicated feeling stressed and upset and was working on just getting through the day (*id.* at 377), in March of 2018, she reported issues with anxiety, emotional regulation, impulse control, frequent panic attacks, and irritability (*id.* at 360), in September of 2018, records indicate excessive worry, depressed mood, suicidal ideation, panic attacks, insomnia, and a belief that she was better off dead but with no plan or intent (*id.* at 358, 363), and in November of 2018, she presented as depressed and reported that her situation went from "bad to worse," (*id.* at 393).

Records from January 2019 note debilitating anxiety (*id.* at 422), and in February of 2019, she reported that she had experienced an anxiety attack in Walmart, (*id.* at 418). While the February, March and April 2019 records cited by the ALJ do reflect relief from anxiety and stable mood, later in April of 2019, Plaintiff reported to the hospital several times with nausea and vomiting. (*Id.* at 595, 604).   And on April 29, 2019, Plaintiff presented to the emergency room with suicidal ideation and reporting that she was "becoming increasingly depressed," and had a specific plan to take her own life.  (*Id.* at 505, 604).   She reported having anxiety that controlled her life and was "making her physically sick." (*Id.* at 570).  Plaintiff was discharged after nine days in the hospital.

By focusing solely on a few records showing improvement and Plaintiff's seeming success on medication, the ALJ appears to overstate Plaintiff's overall mental health as

documented in the longitudinal record.[2]   This is particularly problematic where the limitation in question is a mental health impairment.   As noted by the Second Circuit in *Estrella v. Berryhill*, 925 F.3d 90 (2d Cir. 2019), "[c]ycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."   925 F.3d at 97 (quotation and citation omitted); *see also Bellehsen v. Comm'r of Soc. Sec.*, 851 F. App'x 283, 285 (2d Cir. 2021) ("It is true, as the Commissioner points out, that the record also reflects times during which [Plaintiff's] mood was stable and she reported no excessive anxiety.   But given the cyclical nature of much mental illness, we cannot decide based on the cold record before us whether these examples of improvement provide a sufficient reason to discount Dr. Hertz's opinions."); *Lee G. v. Comm'r of Soc. Sec.*, No. 5:19-CV-1558 (DJS), 2021 WL 22612, at *6 (N.D.N.Y. Jan. 4, 2021) ("Moreover, the presence of cherry-picking is particularly troublesome where, as here, mental health symptoms are involved."); *Pagan v. Saul*, 18-cv-7012 (JGK), 2020 WL 2793023, at *6 (S.D.N.Y. May 29, 2020) ("Mental health patients have good days and bad days; they may respond to different stressors that are not always active." (quotation and

---

[2]      The ALJ also posits that it was a gastric condition, and not Plaintiff's anxiety, causing her nausea and vomiting, an inference Plaintiff challenges as not documented in the record.   Plaintiff also challenges that ALJ's conclusions that the hospitalization was brought on by unusual situational circumstances rather than by her general anxiety and same stressors Plaintiff had been dealing with for years.   Because the Court is remanding this case for further analysis, it need not resolve any issues with the ALJ's inferences at this time.

citation omitted)).  Here, within weeks or months of records reflecting Plaintiff's emotional stability and satisfaction with medication, she was hospitalized for nine days after reporting to the hospital with a concrete plan to take her own life.   While the ALJ's decision addressed the hospitalization and seemingly ties it to a lack of medication, her conclusions nevertheless overstate Plaintiff's emotional stability by cherry-picking only certain records and ignoring others.   Accordingly, the Court concludes that Plaintiff's challenges to the supportability of the ALJ's conclusions go beyond an impermissible request to reweigh the evidence, as suggested by the Commissioner.  *Bradley o/b/o Y.T.B. v. Berryhill*, 305 F. Supp. 3d 460, 464 (W.D.N.Y. 2018) ("By highlighting this issue, the Court does not intend to supplant its interpretation of the record for the ALJ's.  While the Court should not engage in weighing the credibility of evidence or review the underlying matter *de novo*, the Court is required to ensure that the ALJ has satisfied his legal duty.").

.     Certainly, the ALJ is not required to discuss every piece of evidence.  *See Holler v. Saul*, 852 F. App'x 584, 586 (2d Cir. 2021).  But, here, the ALJ's selective reading of the treatment records and highlighting a few records showing that Plaintiff was managing her anxiety while ignoring many other entries to the contrary amounted to impermissible cherry-picking.  *David S. v. Kijakazi*, No. 5:20-CV-01176 (NAM), 2022 WL 705515, at *5 (N.D.N.Y. Mar. 9, 2022) (remanding where although "[a] review of the record shows that at various times Plaintiff appeared to be managing his mental health symptoms and functioning fairly well, which tends to support the ALJ's analysis  . . .the record shows that at other times Plaintiff badly struggled with mental health symptoms"); *Angelo A. C. v.*

*Comm'r*, No. 20-CV-1579-A, 2022 WL 682654, at *6 (W.D.N.Y. Mar. 8, 2022) ("It is well-settled that an ALJ cannot 'cherry pick' only the evidence from medical sources that support a particular conclusion and ignore the contrary evidence." (quotation and citation omitted)).  The problem here was exacerbated further when the ALJ relied on these same conclusions, supported by cherry-picked evidence, to discredit the medical opinions from Dr. Slowik and Dr. Atkins.   In other words, the ALJ's overstated factual findings undoubtedly undermined her assessment of the supportability and consistency of the medical opinions.  As a result, any error was not harmless because had the ALJ credited Dr. Slowik and Dr. Atkins' opinions, it may well have resulted in a different outcome.  *See Younes v. Colvin*, No. 1:14-CV-170 DNH/ESH, 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015) ("ALJ Grabeel thus committed a 'cherry picking' error in the weighting of Dr. Georgiou's forensic opinions.  Even so, a reviewing court may not reverse and remand the case if that error was harmless.  To make that determination, the court must determine whether the result would have been the same absent the error.").

To be clear, the Court takes no position as to whether or not Plaintiff should ultimately be found to be under a disability.  It is for the ALJ to determine on remand.  *See Brady H. v. Comm'r*, No. 1:20-CV-00877 (JJM), 2022 WL 702155, at *6 (W.D.N.Y. Mar. 9, 2022) ("Although ALJ McGuan is not required to credit evidence in the record suggesting more significant functional limitations, plaintiff is entitled to know why he rejected it."); *Newman v. Berryhill*, No. 16 CIV. 9325 (AJP), 2017 WL 4466615, at *19 (S.D.N.Y. Oct. 6, 2017) (noting that "[o]n remand, the ALJ should consider the trends

reflected in [Plaintiff's] more recent treatment records and should avoid "cherry-pick[ing] evidence in support of his own conclusions").  The Court is simply concluding that the ALJ's factual findings were not supported by substantial evidence, as is required, warranting remand.  *See Jackson v. Kijakazi*, No. 20-CV-7476 (JLC), 2022 WL 620046, at *18 (S.D.N.Y. Mar. 3, 2022) ("Courts frequently remand an ALJ's decision when it ignores or mischaracterizes medical evidence or cherry-picks evidence that supports his RFC determination while ignoring other evidence to the contrary.").  Accordingly, because the Court finds error in the ALJ's factual findings and resulting assessment of medical opinion evidence and that the error cannot be considered harmless, remand is warranted on this basis.

### B.   Plaintiff's Remaining Arguments

To the extent Plaintiff identifies other reasons why she contends the ALJ's decision should be vacated, the Court need not reach those arguments because the Court has already determined, for the reasons previously discussed, that remand of this matter for further administrative proceedings is necessary.  *See, e.g., Samantha D. v. Comm'r of Soc. Sec.*, No. 3:18-CV-1280 (ATB), 2020 WL 1163890, at *10 (N.D.N.Y. Mar. 11, 2020); *Raymond v. Comm'r of Soc. Sec.*, 357 F. Supp. 3d 232, 240-41 (W.D.N.Y. 2019).

### CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt. 20) is denied, and Plaintiff's motion for judgment on the pleadings (Dkt. 14) is granted to the extent that the matter is remanded for further administrative

proceedings consistent with this Decision and Order.  The Clerk of Court is directed to enter judgment and close this case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: March 17, 2022
        Rochester, New York

- 21 -